The question to be decided in this case is whether the deceased's subsequent suicide is causally related to his May 26, 1991 closed head injury. The facts are not controverted; only their characterization by two testifying doctors differ and give rise to the controversy.
On May 26, 1991, the deceased, Charles Ashley, was thrown onto the floor from a Cushman cart he was operating during a collision with a steel column within defendant-employer's plant. He did not sustain any visible injuries, but he presented himself at the Wesley Long Community Hospital emergency room three days later with symptoms of hyperventilating and at times, crying. He left the hospital before his examination had been completed. Plaintiff later received psychiatric treatment. The majority appears to have compared plaintiff's behavior before and after the incident and, relying in part upon Dr. Rollins, concluded that plaintiff's suicide was not proximately caused by his May 26, 1991 injury.
Some of the deceased's behavior prior to May 26, 1991, was characterized in testimony four years after his death on September 11, 1991, as "erratic"; however, it was only after the incident with the Cushman cart that management's observation of his "erratic" behavior resulted in its recommendation that decedent seek psychiatric treatment.
On June 28, 1991, the deceased presented to Moore Regional Hospital accompanied by a co-worker or a representative of defendant-employer's Employee Assistance Program. There he reported that he had experienced behavioral and emotional changes since the incident with the Cushman cart. He was concerned that he might harm himself or someone else. As a result, he was admitted to the hospital for psychiatric evaluation and treatment. During his admission, he exhibited "bizarre, angry or inappropriate behaviors."
Plaintiff's key witness, Dr. Robert A. Fleury, a psychiatrist, was deceased's primary treating physician — at defendant's request. He first saw the deceased in June, 1991. He believes that the deceased suffered a closed head injury at work on May 26, 1991, which caused or aggravated deceased's mental problems. He could not remember the deceased after four years, but stated in his deposition that his records reflect that the deceased's conduct became more unusual after the "accident". He believes that all of the information about the deceased's conduct before and after his "accident" is consistent with a diagnosis of "organic personality disorder" resulting from a head injury at work which either caused or significantly aggravated his personality disorder. He ruled out both "narcissistic personality disorder" and "bi-polar affective disorder." He stated that he believes suicide is inconsistent with "narcissistic personality disorder" because those who suffer from this condition shy away from hurting themselves. He does not place too much credence in the characterization of deceased's conduct before the "accident" as abnormal, whereas he does believe that the deceased's conduct after the "accident" was indicative of his having suffered a head injury. If the deceased suffered mental problems prior to his "accident", then Dr. Fleury believes that his work-related injury significantly worsened his condition.
On the other hand, defendant's key witness, Dr. Robert Leroy Rollins, a specialist in forensic psychiatry, evaluated all of the medical evidence and other testimony and concluded that deceased suffered from "narcissistic personality disorder" and "bi-polar affective disorder", but had suffered no closed head injury as a result of his work-related accident". He does not believe that the deceased's complaints resulting from his work-related "injury" or medical tests made at the time support a finding that the deceased suffered a closed head injury. However, he never had occasion to see or examine the deceased and it was five months after the hearing before the deputy commissioner and four and a half years after the deceased's injury that Dr. Rollins was asked by the defendants to make his evaluation of the medical records and other evidence in the case.
The majority of the members of the Commission find that the greater weight of the evidence favors a finding that the deceased did not suffer a closed head injury as a result of his work-related accident on May 26, 1991. However, I must dissent from this key finding since the correct medical diagnosis of the deceased's malady is determinative of the ultimate decision in this case. In my view, greater weight should be accorded the deceased's treating physician, who was selected by the defendants.
The majority finds in paragraph 18 of its Findings of Fact that "Mr. Ashley's behavior began to change during February and March, 199 1. His behavior after the incident on 26 May 1991 was not qualitatively different from his behavior following that incident." I disagree with this finding of fact since both the deceased reflected in his statement on 28 June 1991 that he was concerned that he might harm himself or others and Dr. Fleury recognized a significant change in the deceased's behavior following the incident on May 26, 1991. Indeed, the deceased's suicide itself is a significant behavioral act that is qualitatively different from his behavior prior to the incident and is exactly the kind of action that the deceased feared following his "accident" that caused him to accept the defendant's initiative that he seek medical assistance.
Therefore, I respectfully DISSENT from the majority opinion and would find that the decedent's suicide is causally related to and a direct (if not natural) consequence of his compensable injury on May 26, 1991.
This 18th day of February, 1998.
 S/ _______________________ BERNADINE S. BALLANCE COMMISSIONER